IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF KANSAS

| | |
|---|---|
| REX DWAINE LARRISON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  Case No.  5:25-cv-4025 |
| | ) |
| PHILIP G. McMANIGAL, | )  JURY TRIAL DEMANDED |
| Deputy Sheriff and Detective, | ) |
| Jackson County, Kansas, | ) |
| | ) |
| Defendant. | ) |

## COMPLAINT

COMES NOW Rex Dwaine Larrison by his counsel, and for his cause of action against Defendant Philip G. McManigal, states and alleges as follows.

### DEMAND FOR JURY TRIAL

1.  Plaintiff demands a jury trial for all issues raised herein.

### DESIGNATION OF PLACE OF TRIAL

2.  Plaintiff hereby designates Topeka, Kansas, as the place of trial.

### NATURE OF ACTION

3.  This is an action seeking damages arising out of Defendant's execution and filing of an Affidavit and Application in Support of a Search Warrant that, either intentionally or in reckless disregard of the truth, egregiously and unreasonably omitted matters that, if included, would have destroyed probable cause for the search warrant, which named possible violations of K.S.A. 21-6205, Criminal Desecration (a)(1) and K.S.A. 5402, Murder in the First Degree, as well as the subsequent arrest, and prosecution of Plaintiff for the alleged

possession of an explosive device.

## PARTIES

4.  Plaintiff Rex Dwaine Larrison (hereinafter, "Larrison") is a natural person and resident of Holton, Jackson County, Kansas.

5.  Defendant Philip G. McManigal (hereinafter, "McManigal") is a natural person, and on information and belief, is a resident of Jackson County, Kansas.  At all times relevant hereto, he was a deputy sheriff and detective for Jackson County, Kansas.

6.  At all times relevant to this Complaint, McManigal was acting or failing to act under, and his conduct was engaged in, the color of state law.

## JURISDICTION AND VENUE

7.  Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and 1343.

8.  This Court has jurisdiction over Defendant McManigal because the unlawful acts alleged in this Complaint took place in Jackson County, Kansas, which lies within the District of Kansas.

9.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or acts or omissions giving rise to Plaintiff Larrison's claims occurred in Jackson County, Kansas which lies within the District of Kansas and because McManigal acts and performs his duties and responsibilities within the District of Kansas.

## ALLEGATIONS COMMON TO ALL CLAIMS

10.  On April 16, 2024, McManigal prepared and caused to be filed with the District Court of Jackson County, Kansas, an Affidavit and Application in Support of Search Warrant

("Affidavit")[1] which led the District Court Judge to issue a search warrant that same day. McManigal's Affidavit contained no incriminating allegations and, crucially, failed to include abundant information as follows.

11.  Based on a 2015 interview, McManigal swore that Larrison had engaged in domestic violence in the 1990s and had allegedly bragged he could murder someone and not get caught.  But McManigal failed to disclogbse that there had been no complaint of domestic violence and no police report in the 1990s and that the allegations were without any corroboration.

12.  McManigal swore that on June 20, 2000, Larrison's wife, Yulia[2] (hereinafter, "Yulia"), had told a Holton Police Officer that Larrison "hadn't been treating her right". McManigal failed to disclose the she had told the officer that Larrison had not struck or hurt her; that she had told the offier she was "fine"; that the officer saw no signs of injury; and, that she had no problem with Larrison coming to take her home.

13.  McManigal swore that on July 5, 2000, Larrison had been the subject of a domestic violence report by Yulia, but failed to disclose that the report stated that Larrison had displayed scratches and swelling on an upper arm; that documents substantiated Plaintiff's response to the complaint; and, that the County Attorney had declined to file charges, noting in the report, "Hard to tell what really happened."

14.  McManigal swore that on July 7, 2000, Yulia had filed a Petition for Protection

---

[1]The Affidavit and Application in Support of Search Warrant is Exhibit 1 hereto.

[2]Yulia's last name has been variously spelled as Shevtsenko, Shevchenko, and Chevtchenko.

from Larrison alleging various acts of abuse but he failed to disclose that documents established that Yulia had told others:

(a)  that she and Larrison had met in Russia when they met in Spain;

(b)  that she spoke four languages when she had previously claimed to speak eight;

(c)  that Larrison was a farmer when he had never farmed;

(d)  that she and Larrison lived on a farm when they had never lived on a farm; and,

(e)  that she was not a translator after having represented herself as a translator in INS proceedings, on a previous visa applications, and on her K-1 Fiancée application.

15.  McManigal swore that Larrison had threatened to kill or harm Yulia's brother but failed to disclose that the brother lived in eastern Russia; that Larrison had never been to Russia, there is no evidence that Larrison spoke Russian, knew no one in Russia; and, that in a December 22, 1999, letter accompanying his wife's INS application, Larrison had written that he was concerned about her safety in Russia as "she has been threatened by people in Vladivostok from whom her brother borrowed money".

16.  McManigal swore that on August 11, 2000, the order of protection was dismissed but failed to disclose that Larrison and Yulia had appeared together before the judge and jointly requested that it be dismissed.

17.  McManigal swore simply that Yulia had received a social security number but failed to disclose that in his May 17, 2022 interview with a social security manager he had

been told that the wife used a Russian address as her own months after marrying Larrison and that it was contrary to her INS submissions in which she had used her Holton, Kansas address.

18.  McManigal swore that on May 26, 2000, Yulia opened a Certificate of Deposit but failed to disclose that she had completed a W-8 Certificate of Foreign Status form and listed her former address in Vladivostok, Russia as her permanent address, and her Holton, Kansas address as her mailing address after she had married Larrison, and thus that she intended to return to Russia.

19.  McManigal swore that February 6, 2001, was the last known date Yulia was alive but failed to disclose that Larrison had stated in the marriage annulment agreement that Yulia last lived with Larrison on March 4, 2001.

20.  In the April 16, 2024 Affidavit, McManigal swore that Dan Robinson, a neighbor of Larrison, had told McManigal on August 20, 2001, that *after* February 6, 2001, he had seen Larrison digging in his backyard and then pouring concrete the next morning; that Yulia had not been seen since the day the concrete was poured; and, that Larrison had told Robinson he could kill someone and make the body disappear.  But McManigal failed to disclose:

    (a)  that McManigal had not made a written report or record of the August 20, 2001 conversation with Robinson and did not make such a report until fourteen years later on December 23, 2015;

    (b)  that Robinson had dated the concrete pouring to about a year before August 20, 2001 – not to a date after February 6, 2001;

(c) that McManigal had not informed other law enforcement personnel or prosecuting attorneys at the time of his August 20, 2001 conversation with Robinson;

(d) that a subsequent report by McManigal concerning the alleged disappearance of Yulia quoted Robinson as stating that the concrete had been poured in 2000 – when there is ample evidence of Yulia's activities – not in 2001;

(e) that there existed a report of December 26, 2019 in which Robinson was quoted as saying again that the digging by Larrison before the concrete was poured was in 2000;

(f) that McManigal had created three prosecution summaries that all stated, "It was possibly the summer of 2000 when [Larrison] poured a concrete patio behind his house";

(g) that Robinson had reported the concrete pouring to Holton Chief of Police Lanning and that Lanning had responded that he knew that Yulia was alive at the time Robinson reported the concrete pouring;

(h) that in a report dated June 6, 2023, McManigal had written that he had informed Robinson that Yulia had acquired a Certificate of Deposit on February 6, 2001 and that Robinson then changed what he had been telling law enforcement for twenty-two (22) years and stated that the concrete pouring had to have been after February 6, 2001; and,

(i) that McManigal knew that Yulia had resided in a shelter in Atchison, Kansas during the summer of 2000 and that said absence matched Robinson's memory of her being absent after the concrete pouring in 2000 as Robinson had

6

consistently reported.

21.  McManigal swore that on June 19, 2006, Larrison's subsequent wife, Elena Krivtsova (hereinafter, "Elena"), died as a result of trauma to her face and head which McManigal believed to be suspicious circumstances.  But McManigal failed to disclose:

(a)  that an extensive investigation into the death of Elena was started on June 19 and continued into September 2006 when the death was ruled accidental by the Holton, Kansas Police Department and that ruling was concurred with by the Kansas Bureau of Investigation, and the Jackson County, Kansas Prosecutor;

(b)  that the autopsy found no evidence of any other injuries not consistent with the accident determined by law enforcement;

(c)  that in 2006, during the investigation of Elena's death, Police Chief Lanning had been told by two friends of Elena that Elena and Larrison had a great relationship; and,

(d)  that McManigal misleadingly quoted the autopsy report summary and failed to disclose that in the autopsy report itself, the medical examiner had concluded and written that there "was no anatomic evidence to suggest that there was a physical altercation prior to the concrete pillar landing on her head" and that the police investigation had determined the cause of death to be accidental.

22.  McManigal swore that he believed that "evidence of the crimes of homicide and criminal desecration" of Yulia" will be located by the search for which he sought the warrant but failed to disclose any evidence to support his unsubstantiated hunch.

23.  McManigal's Affidavit consisted of speculation and his unsubstantiated hunch.  It

failed to establish probable cause that a crime had been committed or that Larrison had committed a crime.

24. McManigal swore that he believed that "evidence of the crime of homicide of Elena" would also be located by his proposed search but failed to disclose any evidence to support his unsubstantiated hunch.

25. McManigal swore that evidence was sought as to the alleged crimes at 418 and 420 East 6th Street, Holton, Kansas, but failed to disclose that Larrison acquired those properties in 2018 and 2019, long after the events purported to have been criminal and without providing any facts to suggest that there was cause to believe that evidence of crimes would be found at those locations.

26. Because of material falsehoods and omissions, the Affidavit prepared by McManigal and submitted to the District Court on April 16, 2024 lacked probable cause for a warrant to issue for the search of Larrison's properties.

27. Despite the material falsehoods and omissions depriving the search warrant application of probable cause, a search warrant was served on April 23, 2024 resulting in a search of Larrison's properties without probable cause.

28. Larrison's property was searched beginning on April 23, 2024, including tearing up the concrete patio referred to in McManigal's Affidavit and digging extensively under and around it. The search resulting from McManigal's deficient Affidavit and based only on a hunch found no evidence of any crime, no body, no body parts, and no evidence whatsoever of a murder or desecration of a human body.

29. During the execution of the search warrant on Larrison's properties on April 23,

2024, a piece of PVC pipe was found on property acquired by Larrison in 2018-2019. That pipe had apparently been on that property when Larrison acquired the property and there was no evidence connecting that pipe to Larrison or even suggesting that Larrison had knowledge of its existence. That object was then used to obtain a second search warrant to search for explosive and other destructive devices.

30. During the execution of the second search warrant no additional explosive or other destructive devices were found and the piece of PVC pipe seized during the execution of the first search warrant was not determined to be illegally in the possession of Larrison or anyone else.

31. But for the deficient April 16, 2024 McManigal Affidavit and Application in Support of a Search Warrant, the first search warrant would not have been issued; there would not have been a search of Larrison's properties; no second search warrant would have been issued; and, no expanded search would have been conducted.

32. The false and deficient McManigal Affidavit not only led to destruction and damages to Larrison's property, it also personally damaged him.

33. On April 23, 2024, Larrison was at home when what appeared to him to be a full SWAT team swarmed his home and trained weapons on him while he was inside of a pickup truck. His children were summoned from the house. Larrison was told to exit the truck, was visually checked for weapons, ordered to the ground, handcuffed, allowed to rise to his feet, and taken to the Jackson County Sheriff's Office.

34. On route to the Sheriff's Office, Larrison repeatedly asked what was going on and eventually was told that the officers present were serving a search warrant. When he asked to

see it they refused to show it to him.

35.  Larrison was terrified and concerned about where his children were.

36.  Larrison eventually was told he was free to leave the Sheriff's Office, but he had no transportation from the Sheriff's Office back to his residence.  Officers agreed to transport him back to his property to get a vehicle, albeit telling him they had to wait until his vehicle had been cleared.

37.  When Larrison got back to his property, he observed approximately 60 law enforcement officers, and at least two television news crews recording the scene.

38.  Because his cell phone had been seized, Larrison went to Walmart to buy another one, still with no idea of where his children were.

39.  Larrison proceeded to the home of a local lawyer whom he knew, but shortly after he got there, members of the Sheriff's Department arrived and arrested him in the lawyer's yard.

40.  Larrison asked for an attorney, but he was taken to jail and put in a holding cell where he had no contact with anyone, was refused a phone call, and could not contact an attorney.

41.  Eventually, Larrison was taken from the holding cell and transferred into the main jail, still with no phone call or contact with his children or counsel.  While there, he was served with papers saying that his son was being placed into state custody and that a hearing had been set.

42.  As the search of his property continued, after about 46 hours of being held with no contact with anyone except to send letters by mail to ask for help, Larrison was booked.

43.  With law enforcement officers claiming that one of their number had been endangered, albeit no one was injured, Larrison was charged with criminal use of explosives.

44.  As soon as he was charged, Larrison was released after posting a $50,000.00 bond for which he had to pay a bondsman $5,000.00.

45.  During the search officers took, but did not inventory, $3,500.00 from Larrison's safe which was not returned to him until August 7, 2024, after a judge had ordered it to be returned.

46.  Larrison was obliged to obtain defense counsel and remained released on bond from April 25, 2024, until the charges against him were finally dismissed by the Jackson County Attorney on October 3, 2024.

47.  In sum, McManigal's acts and conduct, specifically his creating and filing the materially false and deficient Affidavit and Application in Support of Search Warrant, caused Larrison to suffer not only the actual damage to his property and the financial harm resulting therefrom and from the cost of being arrested, charged, and defending the charges, but also actual damages including mental distress, anxiety, and agitation as well as emotional suffering, humiliation, embarrassment, insult, and inconvenience.

48.  McManigal's acts and conduct were willful, wanton, reckless, and malicious, and further, showed a complete and deliberate indifference to, and conscious disregard for, the rights of Larrison.  Therefore, Larrison is entitled to an award of punitive or exemplary damages in an amount sufficient to punish McManigal or deter McManigal and others from like conduct in the future.

COUNT I

UNLAWFUL SEARCH AND ENTRY IN VIOLATION OF THE FOURTH AMENDMENT
AS APPLIED TO THE STATES BY THE FOURTEENTH AMENDMENT
42 U.S.C. § 1983

49.  Larrison realleges and incorporates each and every allegation contained in paragraphs 1 - 48 of this Complaint as if fully set forth here.

50.  It was clearly established as long ago as 1978 that affiants seeking warrants violate the Fourth Amendment of the constitution when they knowingly, or with reckless disregard for the truth, include false statements in a supporting affidavit or omit information which, if included, would prevent the warrant from lawfully issuing.

51.  As alleged *supra* at ¶ 10, in preparing and filing the Affidavit, McManigal ignored and omitted disclosure of evidence and facts that would have rendered the Affidavit insufficient to establish probable cause and, whether intentionally or in reckless disregard for the truth, the Affidavit he filed and presented to the District Court judge misrepresented and omitted facts.

52.  The circumstances known to McManigal evinced obvious reasons to doubt the veracity of the allegations in the Affidavit as is apparent from the allegations, *supra* at ¶¶ 11 - 25, and his intention to perpetrate deliberate falsehoods or his acting in reckless disregard of the truth is demonstrated by his withholding of facts that any reasonable person would have known was the kind of thing a judge would wish to know.

53.  As alleged, *supra* at ¶ 23, McManigal had only a bare suspicion – a hunch – that Larrison had committed a crime or even that a crime had been committed.

54.  McManigal lacked arguable probable cause and his conclusion that a search was warranted did not rest on an objectively reasonable belief that probable cause existed.

55. A reasonable officer could not have believed that probable cause existed to conduct a search.

56. Had McManigal disclosed the evidence and facts described *supra* at ¶¶ 11-25, it would have been apparent that McManigal acted in the absence of a substantial probability that a crime had been committed and that Larrison had committed it.

57. Had the District Court judge charged with weighing McManigal's Affidavit had the benefit of all of the facts and evidence that McManigal failed to disclose, he or she would not have reached the conclusion there was probable cause that warranted a search.

58. However, the District Court judge was misled by the Affidavit and the first search warrant was issued and executed.

59. The issuance and execution of the first search warrant in the absence of probable cause led to the issuance and execution of the second search warrant and to the arrest, incarceration, and prosecution of Larrison in violation of Larrison's Fourth Amendment rights. *See also*, *supra* at ¶ 31.

60. The violation of Larrison's Fourth Amendment rights, which would not have transpired but for the acts and omissions of McManigal, caused Larrison to sustain damages as alleged, *supra* at ¶¶ 28, 32 - 47.

61. As alleged, *supra* at ¶ 48, McManigal's acts and conduct were willful, wanton, reckless, and malicious, and further, showed a complete and deliberate indifference to, and conscious disregard for, the rights of Larrison. Therefore, Larrison is entitled to an award of punitive or exemplary damages in an amount sufficient to punish McManigal or deter McManigal and others from like conduct in the future.

**COUNT II**
**UNLAWFUL SEIZURE AND ARREST IN VIOLATION OF THE FOURTH AMENDMENT**
**AS APPLIED TO THE STATES BY THE FOURTEENTH AMENDMENT**
**42 U.S.C. § 1983**

62. Larrison realleges and incorporates each and every allegation contained in paragraphs 1 - 61 of this Complaint as if fully set forth here.

63. As alleged, *supra* at ¶ 59, because the first search warrant was issued without probable cause, the arrest of Larrison while the search was transpiring as well as his subsequent arrest and prosecution were without probable cause and, thus violated Larrison's Fourth Amendment rights.

64. The unlawful seizure, arrests, and prosecution of Larrison in violation of his Fourth Amendment rights, which would not have transpired but for the acts and omissions of McManigal, caused Larrison to sustain damages as alleged, *supra* at ¶¶ 28, 32 - 47.

65. As alleged, *supra* at ¶¶ 48, 61, McManigal's acts and conduct were willful, wanton, reckless, and malicious, and further, showed a complete and deliberate indifference to, and conscious disregard for, the rights of Larrison. Therefore, Larrison is entitled to an award of punitive or exemplary damages in an amount sufficient to punish McManigal or deter McManigal and others from like conduct in the future.

**COUNT III**
**MALICIOUS PROSECUTION IN VIOLATION OF THE FOURTH AMENDMENT**
**AS APPLIED TO THE STATES BY THE FOURTEENTH AMENDMENT**
**42 U.S.C. § 1983**

66. Larrison realleges and incorporates each and every allegation contained in paragraphs 1 - 65 of this Complaint as if fully set forth here.

67. As set forth above, McManigal caused Larrison's confinement and prosecution

by preparing and filing his Affidavit which failed to establish probable cause, leading the District Court to issue the search warrant McManigal wanted, which led to Larrison being arrested – twice, essentially – and prosecuted.

68.  The prosecution of Larrison terminated in Larrison's favor when the charges against him were dismissed by the prosecutor.

69.  As stated, *supra* at ¶ 67, no probable cause supported the original arrest, continued confinement, or prosecution of Larrison.

70.  And, as stated, *supra* at ¶¶ 28, 32 - 47, 60, 64, Larrison sustained damages.

71.  Because McManigal caused the prosecution without probable cause and because he behaved either intentionally or recklessly, malice is inferable.

72.  As alleged, *supra* at ¶¶ 48, 61, 65, McManigal's acts and conduct were willful, wanton, reckless, and malicious, and further, showed a complete and deliberate indifference to, and conscious disregard for, the rights of Larrison.  Therefore, Larrison is entitled to an award of punitive or exemplary damages in an amount sufficient to punish McManigal or deter McManigal and others from like conduct in the future.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Larrison requests that the Court, after a trial by jury of his claims, enter judgment for Plaintiff and against Defendant McManigal for his actual, compensatory, nominal damages, and punitive damages as are proven at trial and are fair and reasonable, for his costs herein, including attorney fees as provided by 42 U.S.C. § 1988, and expenses, and for any other such legal or equitable relief as the Court deems appropriate.

Respectfully submitted,

LAW OFFICE OF ARTHUR A. BENSON II


By_s/ Arthur A. Benson II_____
Arthur A. Benson II  D.Kan. #70134
4006 Central Avenue
Kansas City, Missouri  64111
(816) 531-6565
abenson@bensonlaw.com

Attorney for Plaintiff