## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| REX DWAINE LARRISON, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION |
| v. | ) | |
| | ) | No. 25-4025-KHV |
| PHILIP G. MCMANIGAL, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM AND ORDER

On March 17, 2025, Rex Dwaine Larrison filed suit against Philip G. McManigal, a deputy sheriff and detective for the Sheriff's Office of Jackson County, Kansas. Under 42 U.S.C. § 1983, plaintiff asserts that in violation of his rights under the Fourth Amendment, defendant prepared a search warrant affidavit which lacked probable cause and led to his arrest, prosecution and unlawful search of his properties. This matter is before the Court on Defendant's Motion To Dismiss And Brief In Support (Doc. #5) filed April 28, 2025. For reasons stated below, the Court overrules defendant's motion.

### Legal Standards

In ruling on a motion to dismiss under Rule 12(b)(6), Fed. R. Civ. P., the Court assumes as true all well-pleaded factual allegations and determines whether they plausibly give rise to an entitlement of relief. Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009). To survive a motion to dismiss, a complaint must contain sufficient factual matter to state a claim which is plausible—and not merely conceivable—on its face. Id.; Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). In determining whether a complaint states a plausible claim for relief, the Court draws on its judicial experience and common sense. Iqbal, 556 U.S. at 679–80.

Plaintiff bears the burden to frame his claims with enough factual matter to suggest that he

is entitled to relief; it is not enough to make threadbare recitals of a cause of action accompanied by conclusory statements. See Twombly, 550 U.S. at 556. Plaintiff makes a facially plausible claim by pleading factual content from which the Court can reasonably infer that defendant is liable for the misconduct alleged. Iqbal, 556 U.S. at 678. Plaintiff must show more than a sheer possibility that defendant has acted unlawfully—it is not enough to plead facts that are "merely consistent with" liability. Id. (quoting Twombly, 550 U.S. at 557).

A pleading which offers labels and conclusions, a formulaic recitation of the elements of a cause of action or naked assertions devoid of further factual enhancement will not stand. Iqbal, 556 U.S. at 678. Similarly, where the well-pleaded facts do not permit the Court to infer more than the mere possibility of misconduct, the pleading has alleged—but has not shown—that the pleader is entitled to relief. See id. at 679. The degree of specificity necessary to establish plausibility and fair notice depends on context, because what constitutes fair notice under Rule 8(a)(2), Fed. R. Civ. P., depends on the type of case. Robbins v. Oklahoma, 519 F.3d 1242, 1248 (10th Cir. 2008).

**Factual Background**

Plaintiff's Complaint (Doc. #1) filed March 17, 2025 and the attached Affidavit And Application In Support Of Search Warrant (Doc. #1-1) allege as follows:[1]

Since at least 2000, Rex Dwaine Larrison has resided at 426 East 6th Street in Holton, Jackson County, Kansas. On April 4, 2000, he married Yulia Shevtensko, a Russian citizen. On July 10, 2001, in the District Court of Shawnee County, Kansas, Larrison filed a petition for default annulment of their marriage. Yulia did not attend any court hearings and was last seen in early

---

[1]    In evaluating a motion to dismiss under Rule 12(b)(6), the Court can consider not only the complaint, but also attached exhibits. See Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009).

2001.

On August 18, 2004, Larrison married Elena Kristova, another Russian citizen. On June 19, 2006, Elena died in Larrison's shop at their residence.

From 1989 through 1997, Philip McManigal served as Sheriff of Jackson County, Kansas. From 1997 through September of 2015, McManigal worked for the Kansas Attorney General as a Special Agent and then Special Agent in charge of criminal investigations. Since October of 2015, McManigal has worked as a detective at the Jackson County Sheriff's Office.

On April 16, 2024, McManigal prepared an Affidavit and Application in Support of Search Warrant and filed it with the Jackson County District Court. In the affidavit, McManigal stated that nine years earlier, on November 11, 2015, Sharon Fitsimmons, who had dated Larrison in the 1990s, reported that he was physically abusive to her and had bragged that he could murder someone and not get caught. McManigal's affidavit did not disclose that the allegations lacked corroboration, that nobody filed a domestic violence complaint against Larrison or that no police reports from the 1990s documented the allegations.

McManigal's affidavit recounted that 24 years earlier, on June 20, 2000, Yulia had told Officer Corey Shields of the Holton Police Department that Larrison "hadn't been treating her right." It did not disclose that Yulia told the officer that Larrison had not struck or hurt her; that she told the officer that she was "fine;" that the officer saw no signs of injury; or that she had no problem with Larrison coming to take her home.

McManigal's affidavit also stated that 24 years earlier, on July 5, 2000, Yulia reported to Officer Shields that Larrison had verbally and physically abused her and threatened to have her removed from the country because she was not a legal citizen. It did not disclose that the officer's report also stated that Larrison had scratches and swelling on his upper arm, that documents

substantiated Larrison's response to Yulia's complaint or that the County Attorney had declined to file charges, noting that it was "[h]ard to tell what really happened."

McManigal's affidavit noted that 24 years earlier, on July 7, 2000, Yulia had filed a Petition for Protection which alleged that Larrison had abused her. The affidavit did not disclose that Yulia sometimes gave untrue versions of events.[2]

McManigal's affidavit stated that 24 years earlier, in July of 2000, Yulia told an advocate at a battered women's shelter in Atchison, Kansas that plaintiff had hit her in the stomach, grabbed her by the throat and frequently threatened her and said that if she did not dismiss the Petition for Protection, plaintiff would kill or harm her brother. It did not disclose that Yulia's brother lived in eastern Russia; that Larrison had never been to Russia; that no evidence indicated that Larrison spoke Russian or knew anyone in Russia; or that in a letter in 1999, which accompanied Yulia's INS application, Larrison had stated that he was concerned about her safety in Russia as "she ha[d] been threatened by people in Vladivostok from whom her brother borrowed money."

McManigal's affidavit stated that on August 11, 2000, Yulia had the order of protection dismissed. It did not disclose that Larrison and Yulia had appeared together before the judge and jointly requested the dismissal.

McManigal's affidavit stated that Yulia had received a social security number, but did not disclose that on May 17, 2022, a social security manager told him that months after marrying Larrison, Yulia was using a Russian address—which was contrary to her INS submissions which listed her address as Holton, Kansas.

---

[2]     Yulia had told others that she and Larrison met in Russia, when they actually met in Spain; that she spoke four languages, when she previously claimed to speak eight languages; that Larrison was a farmer, when he never actually farmed; that she and Larrison lived on a farm, when they never lived on a farm; and that she was a translator in INS proceedings when she was not actually a translator.

McManigal's affidavit noted that 24 and 23 years earlier, on October 6, 2000 and February 6, 2001, Yulia opened certificates of deposit at a bank in Topeka, Kansas, with maturity dates of June 6 and October 6, 2001.  Yulia was last seen alive on February 6, 2001, and no one ever claimed the proceeds of the certificates of deposit, which totaled $12,369.75.  McManigal's affidavit did not disclose that after she married Larrison, Yulia completed a W-8 Certificate of Foreign Status form and listed a former address in Vladivostok, Russia as her permanent address, and her address in Holton, Kansas as her mailing address.

McManigal's affidavit stated that Yulia was last seen alive on February 6, 2001 and that on July 10, 2001, in the District Court of Shawnee County, Larrison filed a petition for default annulment of the marriage.  Yulia did not attend any court dates and was never located. McManigal did not disclose that in the marriage annulment agreement, Larrison stated that Yulia had last lived with him on March 4, 2001.

McManigal's affidavit stated that 23 years earlier, on August 20, 2001, Larrison's neighbor Dan Robinson told McManigal that after February 6, 2001, he had seen Larrison digging in his back yard and pouring concrete the next morning, and Yulia had not been seen since then. According to the affidavit, Robinson also stated that Larrison had towed Yulia's car to his shop and dismantled it, and told Robinson that he could kill someone and make the body disappear. McManigal's affidavit did not disclose that McManigal did not prepare a written report about Robinson's statements until December 23, 2015, 14 years later.  Also, it did not disclose that (1) on August 20, 2001, Robinson had said that Larrison poured the concrete about a year before, i.e. around August of 2000; (2) in a report, McManigal later quoted Robinson as stating that

Larrison had poured the concrete in 2000;[3] (3) in a report dated December 26, 2019, McManigal also quoted Robinson as saying that Larrison poured the concrete in 2000; or (4) McManigal created three prosecution summaries which all stated that "[i]t was possibly the summer of 2000" when Larrison poured the concrete.  The affidavit did not disclose that Robinson also told Holton Chief of Police Lanning when Larrison had poured the concrete and Lanning responded that he knew that Yulia was alive at that time.[4]  In a report dated June 6, 2023, McManigal stated that he informed Robinson that Yulia had acquired a certificate of deposit on February 6, 2001 and Robinson then changed his story, claiming that Larrison had poured the concrete after February 6, 2001.  The affidavit omitted this information, along with the fact that Yulia resided in a shelter in Atchison, Kansas during the summer of 2000, which matched Robinson's recollection that she was absent after Larrison poured the concrete in 2000.

In his affidavit, McManigal reported that 18 years earlier, on June 19, 2006, Larrison's new wife, Elena, died of trauma to her face and head; that Larrison claimed that he was moving a large concrete pier with a forklift and it fell and hit Elena; that McManigal thought that the circumstances of Elena's death were suspicious because Elena's injuries did not appear as severe as he would have expected from the force of the concrete pier; that when Elena was transferred to the hospital, medical staff reported that her death was suspicious; or that an autopsy stated that Elena's injuries were consistent with a large object landing on the top of her face and that the manner of death

---

[3]    The complaint alleges that McManigal prepared this "subsequent" report after December 13, 2015 but before December 26, 2019.

[4]    The complaint does not allege that Robinson gave Lanning a specific date when Larrison poured the concrete.

"depends on correlation with the police investigation."[5]  McManigal's affidavit did not disclose that the Holton Police Department conducted an extensive investigation into Elena's death and concluded that it was accidental; that the Kansas Bureau of Investigation and the Jackson County prosecutor concurred with that finding; that the autopsy did not reveal any injuries inconsistent with the finding that Elena's death was accidental; that in 2006, during the investigation of Elena's death, two of her friends told Police Chief Lanning that Elena and Larrison had a great relationship; or that McManigal had misleadingly quoted the autopsy report summary and failed to disclose that the medical examiner found no anatomic evidence of a physical altercation prior to the concrete pillar landing on Elena's head and the police investigation had determined the cause of death to be accidental.

McManigal's affidavit noted that nine years earlier, in December of 2015, Eben Crosby, plaintiff's neighbor, reported to McManigal that eight years before that, in 2007, he went to a warehouse to pick up fencing for plaintiff.  At the warehouse, someone asked Eben if he was "new at this" and if he was "frightened."  The individual told Eben that he and plaintiff were business partners, that together they had made bodies disappear and that he and plaintiff frequently "traded bodies."  In another incident, plaintiff threated to kill Eben and told him that no one would ever find him.

McManigal's affidavit stated that he had searched for Yulia on various electronic databases and social media platforms but could not locate her.  Yulia is posted on the KBI Missing Person website with no response and Facebook's Kansas Missing and Unsolved page with one unfounded

---

[5]    On June 19, 2006, the day that Elena died, she had planned to visit a friend in a neighboring state.  On March 10, 2021, a friend of Elena's said that her death was the result of a fight between Larrison and Elena, and that the two of them used to argue when Elena wanted to go somewhere alone.

response.  McManigal's affidavit cited no evidence that Yulia had left the United States or that Larrison had ever reported her as missing.

McManigal's affidavit stated that he had probable cause to believe that evidence related to the crimes of criminal desecration of a body and first degree murder would be found on plaintiff's properties.  See K.S.A. §§ 21-6205; 21-5402.  McManigal's affidavit stated that he sought evidence of the alleged crimes from plaintiff's properties at 418, 420 and 426 East 6th Street.  Since at least 2000, plaintiff has resided at 426 East 6th Street.  McManigal's affidavit sought evidence from 418 and 420 East 6th Street, but it did not disclose that Larrison had acquired those properties in 2018 and 2019, 17 years after Yulia disappeared and 12 years after Elena died.

McManigal's affidavit noted that Matthew Wilhelm, a previous business associate of Larrison, reported that Larrison kept copious records and documents in his office on the properties and generally did not throw anything away.

On April 23, 2024, based on McManigal's affidavit, a judge of the District Court of Jackson County issued a search warrant for Larrison's residence and surrounding properties. Officers handcuffed Larrison and took him to the Sheriff's Office.

During the search of 426 East 6th Street, officers tore up the concrete patio and dug extensively under and around it.  During the search of the latter-acquired property, officers discovered a piece of PVC pipe.  Based on this discovery, officers obtained a second search warrant for explosive and other destructive devices.  After some 46 hours in jail, officers booked Larrison for criminal use of explosives.  He was released on bond from April 25 to October 3, 2024, when the Jackson County prosecutor dismissed the charges.

On March 17, 2025, Larrison filed suit against McManigal.  Under 42 U.S.C. § 1983, he asserts that in violation of his rights under the Fourth Amendment, McManigal caused the unlawful

search, arrest and prosecution.

## Analysis

McManigal seeks to dismiss the complaint because he is entitled to qualified immunity. Qualified immunity shields government officials from liability for performing discretionary functions if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). A defendant who asserts qualified immunity—including in a motion to dismiss—is presumptively immune from suit. Cuervo v. Sorenson, 112 F.4th 1307, 1314 (10th Cir. 2024). On a motion to dismiss, plaintiff can overcome the presumption if he establishes that the complaint alleges factual content from which the Court can reasonably infer that (1) defendant's conduct violated a constitutional right and (2) that right was clearly established at the time of the alleged violation. Id.; see Iqbal, 556 U.S. at 678.

## I.    Violation Of A Constitutional Right

Plaintiff claims that McManigal intentionally or recklessly made false statements and omitted from his affidavit facts which would have negated probable cause, and that the subsequent search, arrest and prosecution therefore violated the Fourth Amendment. McManigal argues that (1) the facts omitted from the affidavit were not material to the probable cause determination and (2) plaintiff has not alleged facts which establish that he intentionally or recklessly omitted information from the affidavit.

The Fourth Amendment Warrant Clause provides that "no warrants shall issue but upon probable cause, supported by Oath or affirmation." Franks v. Delaware, 438 U.S. 154, 164 (1978). A warrant affidavit must set forth particular facts and circumstances underlying the existence of probable cause, so as to allow the issuing judge to make an independent evaluation of the matter.

Id. at 165.  As explained in Franks, the Fourth Amendment prohibits an applicant for a search warrant from knowingly and intentionally, or with reckless disregard for the truth, making a false statement or omitting information which, if included, would prevent the warrant from lawfully issuing.  Id. at 171; see Kapinski v. City of Albuquerque, 964 F.3d 900, 905 (10th Cir. 2020).

To state a claim for violation of his Fourth Amendment rights based on omissions in a search warrant affidavit, plaintiff must allege facts which establish that (1) the information omitted from defendant's affidavit was material, i.e. if included, the affidavit would not have established probable cause and (2) defendant intentionally or recklessly omitted such information.  Kapinski, 964 F.3d at 905.  McManigal argues that plaintiff has not adequately pled facts which establish either element.

A.    Materiality Of Alleged False Statements And Omissions

When reviewing a determination of probable cause for a search warrant, the Court must consider the totality of the circumstances and determine whether the affidavit establishes a fair probability that contraband or evidence of a crime will be found in a particular place.  United States v. Roach, 582 F.3d 1192, 1200 (10th Cir. 2009).  To link an individual's suspected unlawful activity to his home, the Court does not require "hard evidence" or personal knowledge of illegal activity.  United States v. Biglow, 562 F.3d 1272, 1279 (10th Cir. 2009).  "[A] sufficient nexus is established once an affidavit describes circumstances which would warrant a person of reasonable caution in the belief that the articles sought are at a particular place."  Id.

If evidence is falsified or withheld from an affidavit, the Court determines whether—excluding falsified inculpatory evidence and including withheld exculpatory evidence—a judge would have found probable cause.  See McCarty v. Gilchrist, 646 F.3d 1281, 1286 (10th Cir. 2011); see also Kapinski, 964 F.3d at 905 (to determine materiality, court evaluates whether warrant

would issue in "but-for world" where attesting officer faithfully represented facts) (quotation marks and citation omitted).  In determining whether a judge would have found probable cause, the Court accepts as true the allegations of the complaint.

Plaintiff's complaint includes conclusory allegations that defendant included "material falsehoods" in the affidavit.  <u>Complaint</u> (Doc. #1), ¶¶ 26–27; <u>see also</u> <u>id.</u>, ¶ 32 ("false and deficient" affidavit); <u>id.</u>, ¶ 47 ("materially false and deficient" affidavit); <u>id.</u>, ¶ 52 (intent to "perpetrate deliberate falsehoods" or act recklessly demonstrated because defendant withheld facts).  It does not allege that McManigal's affidavit affirmatively made specific false statements.  The alleged omissions, however, compel the conclusion that McManigal's affidavit made at least one false statement, <u>i.e.</u> that on August 20, 2001, Robinson told McManigal that plaintiff had poured the concrete after February 6, 2001.  <u>Complaint</u> (Doc. #1), ¶ 20.  On August 20, 2001, Robinson actually told McManigal that Larrison had poured the concrete around August of 2000—months before Yulia disappeared.  <u>See</u> <u>id.</u>, ¶ 20(b) ("Robinson had dated the concrete pouring to about a year before August 20, 2001").  Because Yulia was alive throughout 2000 and early 2001, Robinson's statement meant that plaintiff had not buried her below concrete around August of 2000.  Robinson's statement of August 20, 2001, was highly exculpatory.

Some 22 years later, Robinson changed his story and claimed that Larrison poured the concrete after February 6, 2001.  Robinson only tendered that version, however, in response to McManigal's coaching that Yulia was alive at the bank on February 6, 2001—a fact which McManigal omitted from his affidavit.  As noted, McManigal's affidavit falsely attested that on August 20, 2001, Robinson dated the concrete pouring to "after February 6, 2001."  In doing so, it effectively collapsed 22 years in which Robinson stood by his story that plaintiff poured the concrete in 2000 and that he only changed the date to "after February 6, 2001" some 22 years later,

in response to coaching from McManigal.[6]  These misrepresentations and omissions were highly

material to the question of probable cause.

McManigal's affidavit also omitted the facts that prior law enforcement investigations

concluded that Elena's death was accidental and that the autopsy report supported that conclusion.

The omission of these facts is highly relevant to the determination of probable cause and the

accuracy of McManigal's purported belief—articulated some 17 years later—that Elena's injuries

did not appear as severe as he would have expected from the force of the concrete pier.[7]

McManigal's affidavit claimed that he had probable cause to believe that evidence related

to the crimes of criminal desecration of a dead body and first degree murder would be found on

plaintiff's properties.  Affidavit And Application In Support Of Search Warrant (Doc. #1-1) at 1

(citing K.S.A. § 21-6205(a)(1) and K.S.A. § 21-5402).  The Court must determine whether the

affidavit established probable cause even with the false statement about what Robinson said on

August 20, 2001, and the omitted information.  In doing so, the Court first considers the dated

nature of the information in the affidavit.  Probable cause to search cannot be based on stale

---

[6]       The complaint does not allege how many times Robinson repeated his account that plaintiff had poured the concrete around August of 2000, but multiple reports included the same or similar account from Robinson.  See Complaint (Doc. #1) ¶ 20(d) (after August 20, 2001, McManigal quoted Robinson as saying that plaintiff poured concrete in 2000); id., ¶ 20(e) (report dated December 26, 2019 quoted Robinson account that plaintiff poured concrete in 2000); id., ¶ 20(f) (McManigal created three prosecution summaries which noted that plaintiff poured concrete "possibly summer of 2000"); id., ¶ 20(g) (Robinson separately reported to Chief Lanning when plaintiff poured concrete);  id., ¶ 20(h) (for 22 years, Robinson did not change what "he had been telling law enforcement").

[7]       The complaint and McManigal's affidavit do not specify when McManigal first articulated his belief that Elena's injuries were suspicious.  In any event, at the time of Elena's death, medical personnel also thought that her death was "suspicious."  Affidavit And Application In Support Of Search Warrant (Doc. #1-1) at 7.  After an extensive investigation, however, the Holton Police Department and other law enforcement agencies concluded that Elena's death was accidental.

information which no longer suggests that the item sought will be found at the place to be searched. United States v. Shomo, 786 F.2d 981, 984 (10th Cir. 1986). Whether information is too stale to establish probable cause depends on the nature of the criminal activity, the length of the activity and the nature of the property to be seized. Id. Thus, if the property sought is likely to remain in one place for a long time, probable cause may be found despite substantial delay between the occurrence of the event relied on and the issuance of the warrant. Id.; see United States v. Harris, 735 F.3d 1187, 1191–92 (10th Cir. 2013) (close temporal proximity between crime and warrant application not required; relevant question is whether information in search warrant affidavit suggests items sought are currently located in place officers seek to search). Otherwise, even if law enforcement officers had probable cause for a search warrant, they could rarely obtain a warrant to seek evidence in cold cases. Harris, 735 F.3d at 1191–92.

While many of the items sought in the warrant (human remains, video recordings of the property and documents in plaintiff's office) could remain on the property where plaintiff resided for a long time, the delay of many years between the suspected crimes, the alleged incriminating statements and McManigal's affidavit gives the false statement and the omitted information greater weight. McManigal's affidavit cites evidence related to both the disappearance of Yulia in 2001 and the death of Elena in 2006, but it does not explain the inordinate delay in seeking a warrant. The extensive delay suggests that by June of 2023, McManigal did not believe that he had accumulated enough evidence to seek a warrant as to the disappearance of Yulia or the death of Elena, and after a period of no additional leads in either case, he simply decided to seek a search warrant based on information that he had had in his possession for nearly one year.[8] Cf. Bruning

---

[8]    According to the affidavit, the most recent evidence related to Elena's death is that in March of 2021, a friend of Elena stated that her death was the result of a fight with plaintiff.

(continued. . .)

v. Pixler, 949 F.2d 352, 358 (10th Cir. 1991) (one could infer from four-month delay in acting on victim statement that detective did not believe information sufficient to link suspect to crime).

As to probable cause to believe that plaintiff murdered Yulia and desecrated her body, McManigal's affidavit strongly suggests that her body is buried under concrete which plaintiff poured on property where he has resided since at least 2000.[9]  Plaintiff alleges that for 22 years, law enforcement had reported that Robinson stated that Larrison had poured the concrete in about August of 2000, then in 2023, changed his estimate to "after February 6, 2001."  McManigal's affidavit falsely states that Robinson made the incriminating statement in 2001, when in fact he made a highly exculpatory statement in 2001.  The affidavit also omits the facts that Robinson did not change his statement until McManigal told him that Yulia had been at the bank on February 6, 2001 and that when Robinson told Police Chief Lanning when plaintiff had poured the concrete, Lanning responded that he knew that Yulia was alive then.  This omitted information was highly relevant, and strongly suggested that Robinson's most recent claim that plaintiff poured the concrete "after February 6, 2001" was not credible.  With the additional information that Yulia had been seen after plaintiff poured the concrete, the affidavit's remaining allegations—made some 23 years after her disappearance—were insufficient to create probable cause to believe that evidence of her murder or desecration of her body was likely to be found on plaintiff's residential property at 426 East 6th Street or the properties which Larrison acquired nearly 20 years after she

---

[8](. . .continued)
The most recent evidence related to Yulia's disappearance is McManigal's report on June 6, 2023, that Robinson revised his statement about when plaintiff poured the concrete.

[9]      As noted above, McManigal's affidavit stated that he sought evidence of the alleged crimes from three properties which plaintiff owned: 418, 420 and 426 East 6th Street.  Since at least 2000, plaintiff has resided at 426 East 6th Street.  The properties at 418 and 420 East 6th Street were west of and adjacent to the property at 426 East 6th Street.

disappeared.

As to probable cause to believe that evidence of Elena's murder or desecration of her body would be found on plaintiff's properties, McManigal's affidavit states that the circumstances of Elena's death were suspicious because her injuries did not appear as severe as he would have expected from plaintiff's claimed version of the accident, i.e. when he was moving a large concrete pier with a forklift, it fell off and hit Elena. After "extensive investigation," however, several law enforcement agencies concluded that Elena's death was accidental and the autopsy report supported that conclusion. This evidence is highly relevant to the weight of defendant's personal opinion—articulated some 17 years later—that Elena's injuries did not appear as severe as he would have expected from the force of the concrete pier. McManigal's affidavit did not include the prior findings or explain why he rejected them. It therefore vitiated any probable cause to believe that evidence of Elena's murder or the desecration of her body would be found on plaintiff's properties.

Based on the well-pleaded facts in the complaint, the false statement and the omitted information would have vitiated probable cause to believe that evidence related to the crimes of criminal desecration of a dead body and first degree murder of Yulia or Elena would be found on plaintiff's properties. See Iqbal, 556 U.S. at 678–79; see also Cuervo, 112 F.4th at 1314 (when complaint susceptible to multiple interpretations, court should construe liberally to allege constitutional violation).

B.    Allegations That Defendant Intentionally Or Recklessly Omitted Information

McManigal argues that the complaint does not sufficiently allege that in omitting the various matters, he acted intentionally or recklessly. To establish a violation of the Fourth Amendment, plaintiff must allege sufficient facts to establish that defendant's affidavit

intentionally or recklessly omitted the information in question.  Franks, 438 U.S. at 171.

The Court may infer recklessness from alleged "circumstances evincing obvious reasons to doubt the veracity of the allegations."  Kapinski, 964 F.3d at 908 (quoting Beard v. City of Northglenn, Colo., 24 F.3d 110, 116 (10th Cir. 1994)); see id. (inference not mandatory or automatic).  In some circumstances, the egregiousness of an omission may lead to an inference of recklessness.  Id.; see DeLoach v. Bevers, 922 F.2d 618 (10th Cir. 1990) (recklessness inferred from omissions clearly critical to probable cause finding).

As noted, McManigal falsely stated that on August 20, 2001, shortly after Yulia's disappearance, Robinson made a statement incriminating plaintiff, when in fact his statement then was highly exculpatory.  While Robinson later made a statement incriminating plaintiff, he did not do so until 22 years later and only after McManigal coached him about when Yulia was last seen alive.  McManigal omitted this information, as well as Police Chief Lanning's reaction to Robinson's omitted statement, which together established that Yulia was alive months after plaintiff had poured the concrete.  Likewise, McManigal's affidavit omits the fact that some 17 years earlier, investigators had concluded that Elena's death was accidental and that the autopsy report supported this conclusion.  McManigal's affidavit offers no explanation why he waited until April of 2024 to seek a warrant related to the potential murders of Yulia and Elena. Plaintiff has alleged obvious reasons for McManigal to doubt the veracity of the allegations in his affidavit.[10] Plaintiff's allegations therefore permit the Court to infer that McManigal acted recklessly in including the false statement and omitting the exculpatory information.  See Kapinski, 964 F.3d at

---

[10]    If McManigal had believed the allegations in the affidavit, he likely would have sought a warrant shortly after the most recent evidence he had received as to each potential murder. As to Yulia's disappearance, the affidavit cites no evidence which McManigal obtained after Robinson's revised statement in June of 2023.  As to Elena's death, the affidavit cites no evidence which McManigal obtained after Elena's friend's statement in March of 2021.

908 (court may infer recklessness from alleged circumstances evincing obvious reasons to doubt veracity of allegations); Beard, 24 F.3d at 116 (same).   Plaintiff has sufficiently alleged a constitutional violation.

## II.    Clearly Established Law

Whether a right is "clearly established" is an objective test.  A constitutional right is clearly established when it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right."   Heard v. Dulayev, 29 F.4th 1195, 1203 (10th Cir. 2022) (citations omitted).  Under this demanding standard, the alleged violation "must have a sufficiently clear foundation in then-existing precedent" either with "controlling authority or a robust consensus of cases of persuasive authority."  Id. (citations omitted).  The Supreme Court has warned against defining a clearly established right "at a high level of generality" and emphasized that the law must be "particularized to the facts of the case," but this does not mean that a right is only clearly established if a case exists that is factually identical.  Est. of Ceballos v. Husk, 919 F.3d 1204, 1215 (10th Cir. 2019) (citations omitted).  This makes good sense: if a right is clearly established only when a prior case presents identical facts, qualified immunity would apply under every different fact pattern.  Under this standard, officials would always be entitled to qualified immunity so long as their actions—no matter how outrageous or harmful—were sufficiently novel. While the case need not be directly on point, the "existing precedent must place the lawfulness of the defendant's conduct beyond debate."  Heard, 29 F.4th at 1203 (citations and brackets omitted).

In determining the impact of alleged false statements or reckless omissions in a warrant affidavit, "law enforcement officers can have difficulty determining how the relevant legal doctrine . . . will apply to the factual situation the officer confronts."  Harte v. Bd. of Comm'rs of Cnty. of Johnson, Kansas, 864 F.3d 1154, 1202 (10th Cir. 2017) (quotations omitted).  In such

cases, the Court therefore must examine existing law with a high degree of specificity. <u>Kapinski</u>, 964 F.3d at 910. For intentional misstatements, since at least 1990, Tenth Circuit precedent has clearly established that lying in a warrant affidavit is unconstitutional. <u>Id.</u> (because little ambiguity as to what kind of conduct constitutes lying, this general principle suffices to place question beyond constitutional debate and put reasonable law enforcement officers on notice, even absent factually analogous precedent); <u>Harte</u>, 864 F.3d at 1202 (same). On the other hand, where plaintiff alleges only reckless omissions, significant ambiguity exists around how the law applies to a particular factual situation. <u>Kapinski</u>, 964 F.3d at 910; <u>see</u> <u>Harte</u>, 864 F.3d at 1202 (when determining whether officer has recklessly disregarded truth in warrant application, "result depends very much on the facts of each case") (quoting <u>Brosseau v. Haugen</u>, 543 U.S. 194, 201 (2004)). Because of the context-dependent nature of a reckless omission claim, plaintiff must identify a factually analogous precedent to overcome the clearly established prong of qualified immunity. <u>Kapinski</u>, 964 F.3d at 910; <u>see</u> <u>Harte</u>, 864 F.3d at 1202 (plaintiffs must identify case holding that officer acting under similar circumstances violated Fourth Amendment).

Since at least 1991, the law has been clearly established that an officer violates a plaintiff's Fourth Amendment rights by knowingly or recklessly making a false statement in an affidavit in support of an arrest or search warrant, if the false statement were material to the finding of probable cause. <u>Bruning</u>, 949 F.2d at 357 (citing <u>Franks</u>, 438 U.S. at 155–56). Likewise, the law has been clearly established that in an affidavit in support of an arrest or search warrant, an officer cannot knowingly or recklessly omit information which, if included, would have vitiated probable cause. <u>Id.</u> (citing <u>Stewart v. Donges</u>, 915 F.2d 572, 583 (10th Cir. 1990)). These rights were sufficiently clear that every reasonable officer would have understood that McManigal's affidavit violated plaintiff's Fourth Amendment rights. <u>See</u> <u>Pierce v. Gilchrist</u>, 359 F.3d 1279, 1298 (10th Cir. 2004)

("No one could doubt that the prohibition on falsification or omission of evidence, knowingly or with reckless disregard for the truth, was firmly established as of 1986, in the context of information supplied to support a warrant for arrest."); see also Bledsoe v. Carreno, 53 F.4th 589, 617 (10th Cir. 2022) (by 1999, officers on notice that suppressing exculpatory evidence, fabricating evidence and using that evidence to arrest, detain and prosecute plaintiff was unconstitutional).

McManigal argues that plaintiff has not identified a Tenth Circuit case "where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment." Defendant's Reply In Support Of Dismissal (Doc. #12) filed June 12, 2025 at 1 (quoting Harte, 864 F.3d at 1202). McManigal argues that at most, his "omission of immaterial facts" amounts to negligence. Id. at 4.

McManigal mischaracterizes the importance of his misstatement and omissions to the question of probable cause. As to Yulia, McManigal's affidavit lied about what Robinson had said several months after her disappearance. As explained above, in August of 2001, Robinson's statement was highly exculpatory and established that plaintiff did not bury her under the concrete. Even though some 22 years later Robinson changed his story, he did so after McManigal coached him. As to Elena, McManigal omitted the fact that law enforcement had previously concluded that her death was accidental. This false statement and the omission of "highly material" information collectively vitiated probable cause. See Stewart, 915 F.2d at 583 (because alleged omission was "highly material" and would have invalidated probable cause had it been included in affidavit, officer not entitled to qualified immunity on motion to dismiss); see also Bruning, 949 F.2d at 358 (affirming denial of qualified immunity on summary judgment because plaintiff had specific evidence from which one could infer defendants recklessly made false statements in and

-19-

omitted material information from warrant affidavits).  While plaintiff has not identified a case with identical facts, the existing precedent places the unlawfulness of McManigal's conduct beyond debate.  Heard, 29 F.4th at 1203; see Bledsoe, 53 F.4th at 615 (affirming denial of qualified immunity on motion to dismiss because inculpatory evidence insufficient to establish arguable probable cause when considered with suppressed exculpatory evidence and fabricated evidence); see also Luethje v. Kyle, 131 F.4th 1179, 1188 (10th Cir. 2025) ("[g]eneral statements of the law" can clearly establish right for qualified immunity purposes if they apply "with obvious clarity to the specific conduct in question"); Est. of Smart v. City of Wichita, 951 F.3d 1161, 1168 (10th Cir. 2020) (task not scavenger hunt for prior cases with precisely same facts, and prior case need not be exactly parallel to alleged conduct for officials to have been on notice of clearly established law).

Accepting plaintiff's version of the facts in the complaint and based on the state of the law on April 16, 2024, reasonable officers would have been aware that McManigal's alleged conduct was a violation of plaintiff's rights under the Fourth Amendment.  As explained above, McManigal falsely reported that shortly after Yulia's disappearance, Robinson had made an incriminatory statement when in fact his statement was highly exculpatory.  Any reasonable officer would have understood that this false statement combined with the omitted information about Yulia's disappearance and law enforcement's conclusion that Elena's death was accidental vitiated probable cause for the warrant to search plaintiff's properties.  Because plaintiff has alleged the violation of his clearly established right to be free from an unreasonable search, defendant is not entitled to qualified immunity on plaintiff's claims.  The Court therefore overrules defendant's motion to dismiss.

**IT IS THEREFORE ORDERED** that Defendant's Motion To Dismiss And Brief In

Support (Doc. #5) filed April 28, 2025 is **OVERRULED**.

Dated this 2nd day of September, 2025 at Kansas City, Kansas.

s/ Kathryn H. Vratil
KATHRYN H. VRATIL
United States District Judge