**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **REX DWAINE LARRISON,** **Plaintiff,** | ) | **CIVIL ACTION** |
| **v.** | ) | **No. 25-4025-KHV** |
| **PHILIP G. MCMANIGAL,** **Defendant.** | ) | |

**MEMORANDUM AND ORDER**

On March 17, 2025, Rex Dwaine Larrison filed suit against Philip G. McManigal, a deputy sheriff and detective for the Sheriff's Office of Jackson County, Kansas. Under 42 U.S.C. § 1983, plaintiff asserts that in violation of his rights under the Fourth Amendment, defendant prepared a search warrant affidavit which lacked probable cause and led to his arrest, prosecution and the unlawful search of his properties. This matter is before the Court on Defendant's Motion For Summary Judgment And Memorandum In Support (Doc. #54) filed July 17, 2026. For reasons stated below, the Court overrules defendant's motion.

**Legal Standards**

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." Liberty Lobby, 477 U.S. at 248. A "genuine" factual dispute requires more than a mere scintilla of evidence in support of a party's position. Id. at 252.

The moving party bears the initial burden of showing the absence of any genuine issue of

material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party meets the initial burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial as to those dispositive matters for which he carries the burden of proof. Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986). To carry his burden, the nonmoving party may not rest on his pleadings but must instead set forth specific facts supported by competent evidence. Nahno-Lopez v. Houser, 625 F.3d 1279, 1283 (10th Cir. 2010).

The Court views the record in the light most favorable to the nonmoving party. Deepwater Invs., Ltd. v. Jackson Hole Ski Corp., 938 F.2d 1105, 1110 (10th Cir. 1991). It may grant summary judgment if the nonmoving party's evidence is merely colorable or is not significantly probative. Liberty Lobby, 477 U.S. at 250–51. In response to a motion for summary judgment, a party cannot rely on ignorance of facts, speculation or suspicion and may not escape summary judgment in the mere hope that something will turn up at trial. Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988). The heart of the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." Liberty Lobby, 477 U.S. at 251–52, 106 S.Ct. 2505.

## Factual Background

The following facts are uncontroverted, deemed admitted or construed in the light most favorable to plaintiff.

Since at least 2000, Rex Dwaine Larrison has resided at 426 East 6th Street in Holton, Jackson County, Kansas. On April 4, 2000, he married Yulia Shevtensko, a Russian citizen. Yulia was last seen in early 2001. On August 18, 2004, Larrison married Elena Kristova, another Russian citizen. On June 19, 2006, Elena died in Larrison's shop at their residence.

From 1989 through 1997, Philip McManigal served as Sheriff of Jackson County, Kansas. From 1997 through September of 2015, McManigal worked for the Kansas Attorney General as a special agent and then special agent in charge of criminal investigations. Since October of 2015, McManigal has worked as a detective at the Jackson County Sheriff's Office. McManigal is currently a detective lieutenant for the Jackson County Sheriff's Office.

In 2019, Jackson County Sheriff Tim Morse instructed McManigal to re-open the missing persons case on Yulia Shevtesenko, Larrison's first wife, and the death investigation of Elena Kristova, Larrison's second wife. On April 16, 2024, McManigal prepared an affidavit and application in support of search warrant and filed it with the Jackson County District Court. McManigal sought the warrant to search Larrison's residence for evidence of the suspected murder of his two wives.

Larrison began messaging with Yulia Shevtesenko sometime in 1999 over the internet. Yulia lived in Vladivostok, Russia, and met Larrison in person for the first time in Barcelona, Spain, in 1999. Larrison filled out a K-1 Fiancée Visa application for Yulia in 1999. Yulia entered the United States in January 2000 and married Larrison on April 21, 2000, in Las Vegas, Nevada. Yulia lived with Larrison in his home in Holton, Kansas.

McManigal's affidavit recounted that 24 years earlier, on June 20, 2000, during a traffic stop, Yulia had told Officer Corey Shields of the Holton Police Department that Larrison "hadn't been treating her right." It did not disclose that Yulia told the officer that Larrison had not struck or hurt her; that she told the officer that she was "fine;" that the officer saw no signs of injury; or that she had no problem with Larrison coming to take her home.

McManigal's affidavit also stated that 24 years earlier, on July 5, 2000, Yulia reported to Officer Shields that Larrison had verbally and physically abused her and threatened to have her

removed from the country because she was not a legal citizen. It did not disclose that the officer's report also stated that Larrison had scratches and swelling on his upper arm, that documents substantiated Larrison's response to Yulia's complaint or that the County Attorney had declined to file charges, noting that it was "[h]ard to tell what really happened."

McManigal's affidavit noted that 24 years earlier, on July 7, 2000, Yulia had filed a Petition for Protection which alleged that Larrison had abused her. The affidavit did not disclose that Yulia sometimes gave untrue versions of events.[1]

McManigal's affidavit stated that 24 years earlier, in July of 2000, Yulia told an advocate at a battered women's shelter in Atchison, Kansas, that Larrison had hit her in the stomach, grabbed her by the throat, frequently threatened her and said that if she did not dismiss the Petition for Protection, Larrison would kill or harm her brother. It did not disclose that Yulia's brother lived in eastern Russia; that Larrison had never been to Russia; that no evidence indicated that Larrison spoke Russian or knew anyone in Russia.

McManigal's affidavit stated that on August 11, 2000, Yulia had the order of protection dismissed. It did not disclose that Larrison and Yulia had appeared together before the judge and jointly requested the dismissal.

McManigal's affidavit stated that Yulia had received a social security number, but did not disclose that on May 17, 2022, a social security manager told him that months after marrying Larrison, Yulia was using a Russian address—which was contrary to her INS submissions which listed her address as Holton, Kansas.

---

[1] Yulia had told others that she and Larrison met in Russia, when they actually met in Spain; that she spoke four languages, when she previously claimed to speak eight languages; that Larrison was a farmer, when he never actually farmed; that she and Larrison lived on a farm, when they never lived on a farm; and that she was a translator in INS proceedings when she was not actually a translator.

McManigal's affidavit noted that 24 and 23 years earlier, on October 6, 2000 and February 6, 2001, Yulia opened certificates of deposit at a bank in Topeka, Kansas, with maturity dates of June 6 and October 6, 2001. Yulia was last seen alive on February 6, 2001, and no one ever claimed the proceeds of the certificates of deposit, which totaled $12,369.75. McManigal's affidavit did not disclose that after she married Larrison, Yulia completed a W-8 Certificate of Foreign Status form and listed a former address in Vladivostok, Russia as her permanent address, and her address in Holton, Kansas as her mailing address.

McManigal's affidavit did not disclose that in March of 2001, a person purporting to be "Julia" who spoke with a heavy Russian accent, called then Holton Police Chief Dave Lanning and told him to "stop looking" for her and that she was never coming back to Holton.

McManigal's affidavit stated that Yulia was last seen alive on February 6, 2001 and that on July 10, 2001, in the District Court of Shawnee County, Larrison filed a petition for default annulment of the marriage. Yulia did not attend any court dates and was never located. McManigal did not disclose that in the marriage annulment agreement, Larrison stated that Yulia had last lived with him on March 4, 2001.

McManigal's affidavit stated that 23 years earlier, on August 20, 2001, Larrison's neighbor Dan Robinson told McManigal that after February 6, 2001, he had seen Larrison digging in his back yard and pouring concrete the next morning, and no one had seen Yulia since that day. According to the affidavit, Robinson also stated that Larrison had towed Yulia's car to Larrison's shop, dismantled it and told Robinson that he could kill someone and make the body disappear. McManigal's affidavit did not disclose that McManigal did not prepare a written report about Robinson's statements until December 23, 2015, 14 years later. In that written report, McManigal described Robinson's statement that Larrison had poured the concrete about a year ago, i.e. around

August of 2000. Also, the affidavit did not disclose that in a report on January 1, 2020, McManigal repeated that Larrison had poured the concrete in 2000, and that on December 26, 2019, Robinson confirmed the accuracy of defendant's report from 2015. On June 15, 2026, Robinson testified in his deposition that from the layout of Larrison's property, it was impossible for him to have seen Larrison digging or pouring concrete.

The affidavit did not disclose that on June 6, 2023, McManigal spoke with Robinson by phone, in which McManigal told him that Yulia opened a bank account in February of 2001, and Robinson agreed that when he saw McManigal digging, it must have been after February 6, 2001. McManigal's contemporary hand-written notes state that Robinson's response was that it could have been after February 6, 2001, while his written report states that Robinson said it must have been after February 6, 2001. In his deposition in 2026, Robinson testified that, given the layout of the property, it would have been impossible for him to have seen Larrison digging in the backyard, but he confirmed that he had previously confirmed the accuracy of McManigal's initial 2015 report of their conversation.

McManigal's drafts of the affidavit shifted the time reference in Robinson's statement on August 20, 2001 from "approximately a year ago," to "some time ago," to "possibly between February 6, 2001 and August 20, 2001," to finally the version that was submitted to the court, the definitive "after February 6, 2001." Plaintiff's Exhibits 39, 40, and 41 (Doc. #58-39, 40, 41).

Larrison began messaging Elena Kristova through a Russian dating service website called "Maksim" in November of 2002 and filled out a K-1 Fiancée Visa application for Elena on May 8, 2003. Plaintiff and Elena were married on August 18, 2004 and had a daughter in May of 2005.

In his affidavit, McManigal reported that 18 years earlier, on June 19, 2006, Elena died of

trauma to her face and head; that Larrison claimed that he was moving a large concrete pier with a forklift and that it fell and hit Elena; that McManigal thought that the circumstances of Elena's death were suspicious because Elena's injuries did not appear as severe as he would have expected from the force of the concrete pier; that when Elena was transferred to the hospital, medical staff reported that her death was suspicious; and that an autopsy stated that Elena's injuries were consistent with a large object landing on the top of her face and that the manner of death "depends on correlation with the police investigation."[2]

McManigal's affidavit did not disclose that the Holton Police Department conducted an investigation into Elena's death, including an on-scene investigation, and decided with the Jackson County prosecutor that Elena's death was accidental and to not file criminal charges; that the Kansas Bureau of Investigation concurred with that finding; that the autopsy did not reveal any evidence to suggest a physical altercation prior to the concrete pier landing on her head; and that in 2006, during the investigation of Elena's death, two of her friends told Police Chief Lanning that Elena and Larrison had a great relationship.

McManigal interviewed Elena's treating physician, Dr. Diana Carver on February 22, 2022, from whom he learned—but did not disclose in the affidavit—that Dr. Carver did not recall Elena "having any serious health issues or signs of abuse." McManigal did not disclose that he did not find any life insurance policies for Elena, and, during the Holton Police Department's 2006 investigation into Elena's death, Larrison told an officer that he did not have a life insurance policy for Elena. In February of 2024, McManigal consulted with Johnson County forensic pathologist

[2] On June 19, 2006, the day that Elena died, she had planned to visit a friend in a neighboring state. On March 10, 2021, a friend of Elena's said that her death was the result of a fight between Larrison and Elena, and that the two of them used to argue when Elena wanted to go somewhere alone.

and Chief Medical Examiner, Dr. Diane Peterson, and everything the pathologist reported to McManigal was consistent with Elena's death being accidental. The affidavit did not disclose this information.

McManigal's affidavit noted that nine years earlier, in December of 2015, Eben Crosby, Larrison's neighbor, reported to McManigal that eight years before that, in 2007, he went to a warehouse to pick up fencing for Larrison. At the warehouse, someone asked Eben if he was "new at this" and if he was "frightened." The individual told Eben that he and Larrison were business partners, that together they had made bodies disappear and that he and plaintiff frequently "traded bodies." In another incident, plaintiff threated to kill Eben and told him that no one would ever find him.

McManigal's affidavit stated that he had searched for Yulia on various electronic databases and social media platforms but could not locate her. Yulia is posted on the KBI Missing Person website with no response and Facebook's Kansas Missing and Unsolved page with one unfounded response.

McManigal's affidavit stated that he had probable cause to believe that evidence related to the crimes of criminal desecration of a body and first degree murder would be found on plaintiff's properties. See K.S.A. §§ 21-6205; 21-5402. McManigal's affidavit stated that he sought evidence of the alleged crimes from plaintiff's properties at 418, 420 and 426 East 6th Street. Since at least 2000, plaintiff has resided at 426 East 6th Street. McManigal's affidavit sought evidence from 418 and 420 East 6th Street, but it did not disclose that Larrison had acquired those properties in 2018 and 2019, 17 years after Yulia disappeared and 12 years after Elena died.

McManigal's affidavit noted that Matthew Wilhelm, a previous business associate of Larrison, reported that Larrison kept copious records and documents in his office on the properties

and generally did not throw anything away.

In the affidavit, McManigal stated that nine years earlier, on November 11, 2015, Sharon Fitsimmons, who had dated Larrison in the 1990s, reported that he was physically abusive to her and had bragged that he could murder someone and not get caught. McManigal's affidavit did not disclose that the allegations lacked corroboration, that nobody filed a domestic violence complaint against Larrison or that no police reports from the 1990s documented the allegations.

On April 23, 2024, based on McManigal's affidavit, a judge of the District Court of Jackson County issued a search warrant for Larrison's residence and surrounding properties. Officers handcuffed Larrison and took him to the Sheriff's Office.

During the search of 426 East 6th Street, officers tore up the concrete patio and dug extensively under and around it. During the search of the latter-acquired properties, officers discovered an improvised explosive device. Based on this discovery, officers obtained a second search warrant for explosive and other destructive devices. After some 46 hours in jail, officers booked Larrison for criminal use of explosives. He was released on bond from April 25 to October 3, 2024, when the Jackson County prosecutor dismissed the charges.

On March 17, 2025, Larrison filed suit against McManigal. Under 42 U.S.C. § 1983, he asserts that in violation of his rights under the Fourth Amendment, McManigal caused the unlawful search, arrest and prosecution.

## Analysis

Since plaintiff has presented evidence to support the facts alleged in his complaint, the Court's analysis here largely follows its Memorandum And Order (Doc. #13) filed September 2, 2025, which overruled defendant's motion to dismiss. In support of his motion for summary judgment, defendant argues that he did not violate plaintiff's Fourth Amendment rights and that

qualified immunity bars plaintiff's claims for unlawful search (Count I), unlawful seizure (Count II) and malicious prosecution (Count III).

## I. Violation Of A Constitutional Right

Plaintiff claims that defendant intentionally or recklessly made false statements and omitted from his affidavit facts which would have negated probable cause, and that the subsequent search, seizure and prosecution therefore violated the Fourth Amendment.[3] Defendant argues that (1) the facts omitted from the affidavit were not material to the probable cause determination and (2) plaintiff has not alleged facts which establish that he intentionally or recklessly omitted information from the affidavit.

The Fourth Amendment Warrant Clause provides that "no warrants shall issue but upon probable cause, supported by Oath or affirmation." Franks v. Delaware, 438 U.S. 154, 164 (1978). A warrant affidavit must set forth particular facts and circumstances underlying the existence of probable cause, so as to allow the issuing judge to make an independent evaluation of the matter. Id. at 165. As explained in Franks, the Fourth Amendment prohibits an applicant for a search warrant from knowingly and intentionally, or with reckless disregard for the truth, making a false statement or omitting information which, if included, would prevent the warrant from lawfully issuing. Id. at 171; see Kapinski v. City of Albuquerque, 964 F.3d 900, 905 (10th Cir. 2020).

To survive summary judgment on his claims for unlawful search and seizure in violation of his Fourth Amendment rights due to false or omitted information in a search warrant affidavit, plaintiff must show that (1) the information omitted from defendant's affidavit was material, i.e. if

[3] The relevant constitutional underpinning for a claim of malicious prosecution under Section 1983 is the Fourth Amendment's right to be free from unreasonable seizures. Becker v. Kroll, 494 F.3d 904, 914 (10th Cir. 2007). Defendant argues, and plaintiff agrees, that his malicious prosecution claim cannot rely on the Fourteenth Amendment since an adequate state law remedy exists. See Becker v. Kroll, 494 F.3d 904, 914 (10th Cir. 2007).

included, the affidavit would not have established probable cause and (2) defendant intentionally or recklessly omitted such information. Kapinski, 964 F.3d at 905. Defendant argues that plaintiff has not identified evidence that establishes either element.

A. Materiality Of Alleged False Statements And Omissions

When reviewing a determination of probable cause for a search warrant, the Court must consider the totality of the circumstances and determine whether the affidavit establishes a fair probability that contraband or evidence of a crime will be found in a particular place. United States v. Roach, 582 F.3d 1192, 1200 (10th Cir. 2009). To link an individual's suspected unlawful activity to his home, the Court does not require "hard evidence" or personal knowledge of illegal activity. United States v. Biglow, 562 F.3d 1272, 1279 (10th Cir. 2009). "[A] sufficient nexus is established once an affidavit describes circumstances which would warrant a person of reasonable caution in the belief that the articles sought are at a particular place." Id.

If evidence is falsified or withheld from an affidavit, the Court determines whether—excluding falsified inculpatory evidence and including withheld exculpatory evidence—a judge would have found probable cause. See McCarty v. Gilchrist, 646 F.3d 1281, 1286 (10th Cir. 2011); see also Kapinski, 964 F.3d at 905 (to determine materiality, court evaluates whether warrant would issue in "but-for world" where attesting officer faithfully represented facts) (quotation marks and citation omitted). In determining whether a judge would have found probable cause, the Court views the evidence in the light most favorable to plaintiff. Under that standard, defendant's affidavit made false material statements and omitted material evidence.

On August 20, 2001, Robinson told defendant that he had seen plaintiff digging and pouring concrete about a year prior, i.e. around August of 2000. Plaintiff's Exhibit 9 (Doc. # 58-9). Defendant's first recorded that statement in 2015, and reaffirmed it in various reports in

subsequent years. See id. On December 26, 2019, Robinson also confirmed the accuracy of defendant's 2015 record of his statement. Id. at 8. It was not until the phone call between defendant and Robinson on June 6, 2023, 22 years after the fact, that Robinson agreed "it had to have been after 2/6/2001," and after defendant told Robinson that Yulia had opened a bank account on February 6, 2001. Id. at 11. Because Yulia was alive throughout 2000 and early 2001, Robinson's statement meant that plaintiff had not buried her below concrete around August of 2000. Robinson's statement of August 20, 2001, was highly exculpatory.

Defendant omitted all of these facts from his affidavit. As noted, defendant's affidavit falsely attested that on August 20, 2001, Robinson dated the concrete pouring to "after February 6, 2001." In doing so, it effectively collapsed 22 years in which Robinson stood by his story that plaintiff poured the concrete in 2000 and that he only changed the date to "after February 6, 2001" some 22 years later, in response to probable coaching from defendant. These misrepresentations and omissions were highly material to the question of probable cause. Defendant also omitted that Police Chief Lanning received a phone call from someone claiming to be Yulia after her alleged disappearance, which is highly relevant to the fact of whether she is actually missing.

McManigal's affidavit also omitted the facts that prior law enforcement investigations concluded that Elena's death was accidental and that the autopsy report supported that conclusion—most notably that the autopsy report found no evidence of injuries prior to the injury from the concrete pier. The omission of these facts is highly relevant to the determination of probable cause and the accuracy of McManigal's purported belief—articulated some 17 years later—that Elena's injuries did not appear as severe as he would have expected from the force of the concrete pier.

McManigal's affidavit claimed that he had probable cause to believe that evidence related

to the crimes of criminal desecration of a dead body and first degree murder would be found on plaintiff's properties. Affidavit And Application In Support Of Search Warrant (Doc. #1-1) at 1 (citing K.S.A. § 21-6205(a)(1) and K.S.A. § 21-5402). The Court must determine whether the affidavit established probable cause even with the false statement and the omitted information. In doing so, the Court first considers the dated nature of the information in the affidavit. Probable cause to search cannot be based on stale information which no longer suggests that the item sought will be found at the place to be searched. United States v. Shomo, 786 F.2d 981, 984 (10th Cir. 1986). Whether information is too stale to establish probable cause depends on the nature of the criminal activity, the length of the activity and the nature of the property to be seized. Id. Thus, if the property sought is likely to remain in one place for a long time, probable cause may be found despite substantial delay between the occurrence of the event relied on and the issuance of the warrant. Id.; see United States v. Harris, 735 F.3d 1187, 1191–92 (10th Cir. 2013) (close temporal proximity between crime and warrant application not required; relevant question is whether information in search warrant affidavit suggests items sought are currently located in place officers seek to search). Otherwise, even if law enforcement officers had probable cause for a search warrant, they could rarely obtain a warrant to seek evidence in cold cases. Harris, 735 F.3d at 1191–92.

While many of the items sought in the warrant (human remains, video recordings of the property and documents in plaintiff's office) could remain on the property where plaintiff resided for a long time, the delay of many years between the suspected crimes, the alleged incriminating statements and defendant's affidavit gives the false statement and the omitted information greater weight. Defendant's affidavit cites evidence related to both the disappearance of Yulia in 2001 and the death of Elena in 2006, but it does not explain the inordinate delay in seeking a warrant.

The extensive delay suggests that by June of 2023, defendant did not believe that he had accumulated enough evidence to seek a warrant as to the disappearance of Yulia or the death of Elena, and after a period of no additional leads in either case, he simply decided to seek a search warrant based on information that he had had in his possession for nearly one year.[4] Cf. Bruning v. Pixler, 949 F.2d 352, 358 (10th Cir. 1991) (one could infer from four-month delay in acting on victim statement that detective did not believe information sufficient to link suspect to crime).

As to probable cause to believe that plaintiff murdered Yulia and desecrated her body, McManigal's affidavit strongly suggests that her body is buried under concrete which plaintiff poured on property where he has resided since at least 2000.[5] Plaintiff alleges that for 22 years, law enforcement had reported that Robinson stated that Larrison had poured the concrete in about August of 2000, then in 2023, changed his estimate to "after February 6, 2001." McManigal's affidavit falsely states that Robinson made the incriminating statement in 2001, when in fact he made an exculpatory statement in 2001. The affidavit also omits the facts that Robinson did not change his statement until McManigal told him that Yulia had been at the bank on February 6, 2001 and that when Robinson told Police Chief Lanning when plaintiff had poured the concrete, Lanning responded that he knew that Yulia was alive then. This omitted information was highly relevant, and strongly suggested that Robinson's most recent claim that plaintiff poured the concrete "after February 6, 2001" was not credible. With the additional information that Yulia

[4] According to the affidavit, the most recent evidence related to Elena's death is that in March of 2021, a friend of Elena stated that her death was the result of a fight with plaintiff. The most recent evidence related to Yulia's disappearance is McManigal's report on June 6, 2023, that Robinson revised his statement about when plaintiff poured the concrete.

[5] As noted above, McManigal's affidavit stated that he sought evidence of the alleged crimes from three properties which plaintiff owned: 418, 420 and 426 East 6th Street. Since at least 2000, plaintiff has resided at 426 East 6th Street. The properties at 418 and 420 East 6th Street were west of and adjacent to the property at 426 East 6th Street.

had been seen after plaintiff poured the concrete, the affidavit's remaining allegations—made some 23 years after her disappearance—were insufficient to create probable cause to believe that evidence of her murder or desecration of her body was likely to be found on plaintiff's residential property at 426 East 6th Street or the properties which Larrison acquired nearly 20 years after she disappeared.

As to probable cause to believe that evidence of Elena's murder or desecration of her body would be found on plaintiff's properties, McManigal's affidavit states that the circumstances of Elena's death were suspicious because her injuries did not appear as severe as he would have expected from plaintiff's claimed version of the accident, i.e. when he was moving a large concrete pier with a forklift, it fell off and hit Elena. After "extensive investigation," however, several law enforcement agencies concluded that Elena's death was accidental and the autopsy report supported that conclusion. This evidence is highly relevant to the weight of defendant's personal opinion—articulated some 17 years later—that Elena's injuries did not appear as severe as he would have expected from the force of the concrete pier. McManigal's affidavit did not include the prior findings or explain why he rejected them. It therefore vitiated any probable cause to believe that evidence of Elena's murder or the desecration of her body would be found on plaintiff's properties.

Viewing the evidence in the light most favorable to him, plaintiff has shown a genuine issue of material fact whether the false statement and the omitted information would have vitiated probable cause to believe that relevant evidence would be found on plaintiff's properties. Defendant's argument to the contrary isolates individual allegations and attempts to discredit them one by one, but ultimately fails to persuade the Court that he is entitled to judgment as a matter of law.

B. Allegations That Defendant Intentionally Or Recklessly Omitted Information

Defendant argues that plaintiff has not shown that in omitting the various matters, he acted intentionally or recklessly. To establish a violation of the Fourth Amendment, plaintiff must show that defendant's affidavit intentionally or recklessly omitted the information in question. Franks, 438 U.S. at 171.

The Court may infer recklessness from alleged "circumstances evincing obvious reasons to doubt the veracity of the allegations." Kapinski, 964 F.3d at 908 (quoting Beard v. City of Northglenn, Colo., 24 F.3d 110, 116 (10th Cir. 1994)); see id. (inference not mandatory or automatic). In some circumstances, the egregiousness of an omission may lead to an inference of recklessness. Id.; see DeLoach v. Bevers, 922 F.2d 618 (10th Cir. 1990) (recklessness inferred from omissions clearly critical to probable cause finding).

As noted, McManigal falsely stated that on August 20, 2001, shortly after Yulia's disappearance, Robinson made a statement incriminating plaintiff, when in fact his statement then was highly exculpatory. While Robinson later made a statement incriminating plaintiff, he did not do so until 22 years later and only after McManigal coached him about when Yulia was last seen alive. McManigal omitted this information, as well as Police Chief Lanning's reaction to Robinson's omitted statement, which together established that Yulia was alive months after plaintiff had poured the concrete. Further, a reasonable jury could conclude that defendant's shifting language in his affidavit drafts show he intentionally deceived the judge as to Robinson's statement. Defendant in the draft affidavits shifted the time reference from "approximately a year ago" (i.e. August of 2020), to "some time ago," to "possibly between February 6, 2001 and August 20, 2001," to finally the version that was submitted to the court, the definitive "after February 6, 2001." Plaintiff's Exhibits 39, 40, and 41 (Doc. #58-39-40-41). Whether these

revisions evidence his intention to omit information or make a false statement is a material fact best left to the jury.

Likewise, defendant's affidavit omits the fact that some 17 years earlier, investigators had concluded that Elena's death was accidental and that the autopsy report supported this conclusion. Defendant's affidavit offers no explanation why he waited until April of 2024 to seek a warrant related to the potential murders of Yulia and Elena. Plaintiff has alleged obvious reasons for defendant to doubt the veracity of the allegations in his affidavit.[6] Plaintiff's allegations therefore permit the Court to infer that McManigal acted intentionally or recklessly in including the false statement and omitting the exculpatory information. See Kapinski, 964 F.3d at 908 (court may infer recklessness from alleged circumstances evincing obvious reasons to doubt veracity of allegations); Beard, 24 F.3d at 116 (same).

For these reasons, plaintiff has demonstrated a genuine issue of material fact whether defendant committed one or more constitutional violations.

## II. Qualified Immunity

Section 1983 allows an injured person to seek damages against an individual who has violated his or her federal rights while acting under color of state law. Cillo v. City of Greenwood Village, 739 F.3d 451, 459 (10th Cir. 2013). An individual defendant named in a Section 1983 action may raise a defense of qualified immunity, which shields public officials from damages actions unless their conduct was unreasonable in light of clearly established law. Gann v. Cline, 519 F.3d 1090, 1092 (10th Cir. 2008). Qualified immunity shields government officials from

---

[6] If defendant had believed the allegations in the affidavit, he likely would have sought a warrant shortly after the most recent evidence he had received as to each potential murder. As to Yulia's disappearance, the affidavit cites no evidence which McManigal obtained after Robinson's revised statement in June of 2023. As to Elena's death, the affidavit cites no evidence which McManigal obtained after Elena's friend's statement in March of 2021.

liability for performing discretionary functions if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Qualified immunity should protect "all but the plainly incompetent or those who knowingly violate the law," and the burden on plaintiff is "heavy" to overcome defendant's summary judgment motion based on qualified immunity. Malley v. Briggs, 475 U.S. 335, 341 (1986); Medina v. Cram, 252 F.3d 1124, 1128 (10th Cir. 2001). At summary judgment, the Court must grant qualified immunity unless plaintiff can show that a reasonable jury could find facts supporting (1) a violation of a constitutional right which was (2) clearly established at the time of defendant's conduct. 42 U.S.C. § 1983; Est. of Booker v. Gomez, 745 F.3d 405, 411 (10th Cir. 2014). As discussed above, plaintiff has demonstrated a genuine issue of material fact whether defendant committed one or more violations of plaintiff's constitutional rights.

For the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point or the clearly established weight of authority from other courts must have found the law to be as plaintiff maintains. Fogarty v. Gallegos, 523 F.3d 1147, 1161 (10th Cir. 2008). The rule's contours must be so well defined that it is clear and apparent to a reasonable officer that his conduct was unlawful in the situation he confronted. District of Columbia v. Wesby, 583 U.S. 48 (2018).

Plaintiff is not required to show that a prior court held the exact act in question to be unlawful. Weigel v. Broad, 544 F.3d 1143, 1153 (10th Cir. 2008). The Court "cannot find qualified immunity wherever we have a new fact pattern" because "there will almost never be a previously published opinion involving exactly the same circumstances." Casey v. City of Fed. Heights, 509 F.3d 1278, 1284 (10th Cir. 2007). The Court therefore uses a sliding scale to

determine when law is clearly established: the more obviously egregious the conduct is in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation. Booker, 745 F.3d at 427.

Whether a right is "clearly established" is an objective test. A constitutional right is clearly established when it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Heard v. Dulayev, 29 F.4th 1195, 1203 (10th Cir. 2022) (citations omitted). Under this demanding standard, the alleged violation "must have a sufficiently clear foundation in then-existing precedent" either with "controlling authority or a robust consensus of cases of persuasive authority." Id. (citations omitted). The Supreme Court has warned against defining a clearly established right "at a high level of generality" and emphasized that the law must be "particularized to the facts of the case," but this does not mean that a right is only clearly established if a case exists that is factually identical. Est. of Ceballos v. Husk, 919 F.3d 1204, 1215 (10th Cir. 2019) (citations omitted). This makes good sense: if a right is clearly established only when a prior case presents identical facts, qualified immunity would apply under every different fact pattern. Under this standard, officials would always be entitled to qualified immunity so long as their actions—no matter how outrageous or harmful—were sufficiently novel. While the case need not be directly on point, the "existing precedent must place the lawfulness of the defendant's conduct beyond debate." Heard, 29 F.4th at 1203 (citations and brackets omitted).

In determining the impact of alleged false statements or reckless omissions in a warrant affidavit, "law enforcement officers can have difficulty determining how the relevant legal doctrine . . . will apply to the factual situation the officer confronts." Harte v. Bd. of Comm'rs of Cnty. of Johnson, Kansas, 864 F.3d 1154, 1202 (10th Cir. 2017) (quotations omitted). In such cases, the Court therefore must examine existing law with a high degree of specificity. Kapinski,

964 F.3d at 910. For intentional misstatements, since at least 1990, Tenth Circuit precedent has clearly established that lying in a warrant affidavit is unconstitutional. Id. (because little ambiguity as to what kind of conduct constitutes lying, this general principle suffices to place question beyond constitutional debate and put reasonable law enforcement officers on notice, even absent factually analogous precedent); Harte, 864 F.3d at 1202 (same). On the other hand, where plaintiff argues only reckless omissions, significant ambiguity exists around how the law applies to a particular factual situation. Kapinski, 964 F.3d at 910; see Harte, 864 F.3d at 1202 (when determining whether officer has recklessly disregarded truth in warrant application, "result depends very much on the facts of each case") (quoting Brosseau v. Haugen, 543 U.S. 194, 201 (2004)). Because of the context-dependent nature of a reckless omission claim, plaintiff must identify a factually analogous precedent to overcome the clearly established prong of qualified immunity. Kapinski, 964 F.3d at 910; see Harte, 864 F.3d at 1202 (plaintiffs must identify case holding that officer acting under similar circumstances violated Fourth Amendment).

Since at least 1991, the law has been clearly established that an officer violates a plaintiff's Fourth Amendment rights by knowingly or recklessly making a false statement in an affidavit in support of an arrest or search warrant, if the false statement were material to the finding of probable cause. Bruning, 949 F.2d at 357 (citing Franks, 438 U.S. at 155–56). Likewise, the law has been clearly established that in an affidavit in support of an arrest or search warrant, an officer cannot knowingly or recklessly omit information which, if included, would have vitiated probable cause. Id. (citing Stewart v. Donges, 915 F.2d 572, 583 (10th Cir. 1990)). These rights were sufficiently clear that every reasonable officer would have understood the law and how to apply it in this case. See Pierce v. Gilchrist, 359 F.3d 1279, 1298 (10th Cir. 2004) ("No one could doubt that the prohibition on falsification or omission of evidence, knowingly or with reckless disregard for the

truth, was firmly established as of 1986, in the context of information supplied to support a warrant for arrest."); see also Bledsoe v. Carreno, 53 F.4th 589, 617 (10th Cir. 2022) (by 1999, officers on notice that suppressing exculpatory evidence, fabricating evidence and using that evidence to arrest, detain and prosecute plaintiff was unconstitutional).

Defendant acknowledges that it is a violation of the Fourth Amendment for an arrest warrant affiant to knowingly, or with reckless disregard for the truth, include false statements or omit material information from the affidavit which, if included would have vitiated probable cause. Defendant's Motion For Summary Judgment And Memorandum In Support (Doc. #54) at 17. Defendant simply argues that he did not include material false statements or omit material information, as discussed above.

As explained above, the Court finds that a reasonable jury could find that defendant made false material statements and omitted highly material information, collectively vitiating probable cause. See Bruning, 949 F.2d at 358 (affirming denial of qualified immunity on summary judgment because plaintiff had specific evidence from which one could infer defendants recklessly made false statements in and omitted material information from warrant affidavits). The existing precedent places the unlawfulness of defendant's conduct, if proven, beyond debate. Heard, 29 F.4th at 1203; see Bledsoe, 53 F.4th at 615 (affirming denial of qualified immunity because inculpatory evidence insufficient to establish arguable probable cause when considered with suppressed exculpatory evidence and fabricated evidence); see also Luethje v. Kyle, 131 F.4th 1179, 1188 (10th Cir. 2025) ("[g]eneral statements of the law" can clearly establish right for qualified immunity purposes if they apply "with obvious clarity to the specific conduct in question"); Est. of Smart v. City of Wichita, 951 F.3d 1161, 1168 (10th Cir. 2020) (task not scavenger hunt for prior cases with precisely same facts, and prior case need not be exactly parallel

to alleged conduct for officials to have been on notice of clearly established law).

Reasonable officers would have been aware that defendant's alleged conduct was a violation of plaintiff's rights under the Fourth Amendment. As explained above, defendant falsely reported that shortly after Yulia's disappearance, Robinson had made an incriminatory statement when in fact his statement was exculpatory. Any reasonable officer would have understood that this false statement combined with the omitted information about Yulia's disappearance and law enforcement's conclusion that Elena's death was accidental could vitiate probable cause for the warrant to search plaintiff's properties. Because plaintiff has shown a genuine issue of material fact concerning the violation of his clearly established right to be free from an unreasonable search, seizure and malicious prosecution, defendant is not entitled to qualified immunity on plaintiff's claims. The Court therefore overrules defendant's motion.

**IT IS THEREFORE ORDERED** that Defendant's Motion For Summary Judgment And Memorandum In Support (Doc. #54) filed July 17, 2026 is **OVERRULED**.

Dated this 29th day of September, 2026 at Kansas City, Kansas.

/s/ Kathryn H. Vratil
KATHRYN H. VRATIL
United States District Judge